695 A.2d 313

JAMES TORNATORE, PLAINTIFF–APPELLANT, v. SELECTIVE
INSURANCE COMPANY OF AMERICA, DEFENDANT–
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 23, 1997—Decided June 17, 1997.

Before Judges KING, CONLEY and LOFTUS.

*Randolph I. Conn* argued the cause for appellant (*Greenblatt, Lieberman & Conn*, attorneys; *Mr. Conn*, on the brief).

*Michael E. Carson* argued the cause for respondent (*Tucker, Latterman & Munyon*, attorneys; *Mr. Carson*, on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

## I.

This is an unusual claim asserted by plaintiff James Tornatore under the uninsured motorist endorsement of a standard automobile policy. Uninsured motorist insurance (UM) is compulsory in New Jersey under *N.J.S.A.* 17:28–1.1, which requires all carriers offering automobile liability insurance to also provide coverage:

for payment of all or part of the sums which the insured ... shall be legally entitled to recover as damages from the operator or owner of an uninsured motor vehicle or hit and run motor vehicle ... because of bodily injury, sickness or disease ... sustained by the insured, *caused by accident and arising out of the ownership, maintenance or use of such uninsured or hit and run motor vehicle.*

[*N.J.S.A.* 17:28–1.1(a)(emphasis added)].

This statute defines the scope of the coverage afforded by defendant Selective Insurance Company of America (Selective), although its policy describes UM coverage in slightly different language.[1] Under Selective's UM coverage the issues of legal

---

[1] Selective's insuring agreement states:

liability and damages are decided through arbitration.[2]  In New Jersey UM coverage questions are customarily decided by the court.  *Ohio Cas. Ins. Co. v. Benson,* 87 *N.J.* 191, 194–99, 432 *A.*2d 905 (1981); *New Jersey Manufacturers Ins. Co. v. Franklin,* 160 *N.J.Super.* 292, 297, 389 *A.*2d 980 (App.Div.1978); 2 Alan I. Widiss, *Uninsured and Underinsured Motorist Law* §§ 24.6, 24.7 (2nd ed.1992); *cf. In re Matter of Arbitration Between Grover,* 80 *N.J.* 221, 230, 403 *A.*2d 448 (1979).  This dichotomy of arbitrator-court responsibility also is reflected in Selective's policy language.

The operative facts are undisputed;  the legal consequences of these facts on the issues of UM coverage and ultimate liability are sharply disputed.  Generally, the factual allegations must be measured against the policy language to determine whether the allegations "fall within the risk insured against."  *Ohio Cas. Ins.*

---

We will pay damages which an "insured" is legally entitled to recover from the owner or operator of an "uninsured motor vehicle" or "underinsured motor vehicle" where such coverage is indicated as applicable in the Schedule or Declarations because of:
1. "Bodily injury" sustained by an "insured" and caused by an accident; and
2. "Property damage" caused by an accident except under paragraph 2. of the definition of "uninsured motor vehicle."
The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the "uninsured motor vehicle" or "underinsured motor vehicle."  We will pay damages under this coverage caused by an accident with an "underinsured motor vehicle" only after the limits of liability under any applicable liability bonds or policies have been exhausted by payment of judgments or settlements.

[2] Selective's policy states:

**ARBITRATION**
If we and an "insured" do not agree:
1. Whether that person is legally entitled to recover damages under this endorsement;  or
2. As to the amount of damages;
either party may make a written demand for arbitration.  In this event, each party will select an arbitrator.  The two arbitrators will select a third.  If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction.

*Co. v. Flanagin*, 44 *N.J.* 504, 512, 210 *A.*2d 221 (1965). Plaintiff describes the historic facts this way in his brief:

> On January 20, 1990, the plaintiff, an off-duty Emergency Medical Technician, stopped to render assistance at a multi-vehicle accident scene on Interstate Route 295 and Route 42 in Bellmawr, New Jersey. The accident involved three charter buses and two trucks. It is undisputed that the accident was caused by a phantom automobile that fled the scene. Plaintiff entered one of the buses to render aid to injured passengers when someone on the bus yelled "fire" and panic ensued. Plaintiff was knocked down in the rush to escape the fire and suffered personal injuries.

Selective in its brief agrees that "for purposes of this appeal, the facts as plaintiff has alleged are not disputed." Selective describes the facts as follows:

> Plaintiff is an emergency medical technician. On January 20, 1990, while he was off-duty, plaintiff stopped to render assistance at the scene of a multiple-vehicle accident which occurred on I-295 and Route 42 in Bellmawr, New Jersey. The accident involved three charter buses and two trucks. The accident was reportedly initiated by an automobile which went out of control and came to rest in such a way that it blocked a portion of the highway. The vehicle then fled the scene (thus qualifying it as a so-called "phantom" vehicle for the purposes of uninsured motorist coverage).
>
> Plaintiff had entered one of the buses to assist the passengers when someone yelled "fire." Plaintiff alleges that he was knocked down and injured in the panic which ensued.

The unusual events leading to this claim are corroborated by the "accident description" contained in the State Police report:

> Investigation revealed an unknown vehicle, Veh. X, went out of control and was facing S/B in the N/B I-76 left express lane. Vch. X then attempted to turn but blocked both the left and right lanes of I-76 N/B express lanes. Vehicle # 1 then stopped in the left lane to avoid Veh. X. Veh. # 2 then stopped directly behind Veh. # 1. Veh. # 3 then stopped in the right lane next to Veh. # 1 to avoid Veh. X. Veh. # 4 then stopped in the far left lane directly behind Veh. # 2. Veh. # 5, a tractor trailer (trailer RE6T898JT-NJ-James D. Bailey, N. Cape May, NJ) then struck Veh. # 4 in the rear, pushing Veh. 4 into Veh. 2. The impact of Veh. 4 striking Veh. 2 in the rear caused Veh. 2 to strike Veh. 1 in the right rear end and Veh. 3 in the left side.
>
> Veh. X then left the scene, none of the other vehicles involved made impact with Veh. X. Veh. X possibly fled N/B on I-295. All Bellmawr S.P. Patrol were alerted to attempt to locate the vehicle. Bordentown State Police were unsuccessful. There were varying descriptions of Veh. X, including a Ford, a Dodge, a Plymouth and colors included off white, tan or brown. It is unknown if Veh. X had any damage.

Vehicles # 2, # 3 and # 4 were casino buses loaded with a total of 126 passengers. They are all listed on the bus seating diagrams attached. There were 23 injured on buses # 4 and # 2. Their names, addresses and injuries are listed on an attached sheet.

DR # 5 issued summons for careless driving.

Plaintiff filed a UM claim with Selective which denied UM coverage and refused to arbitrate on the issues of common-law liability and damages. Plaintiff then filed this action to compel arbitration. After briefing and argument, the Law Division judge, considering *Lindstrom v. Hanover Insurance Co.*, 138 *N.J.* 242, 649 *A.*2d 1272 (1994) (4–3 allowing PIP benefits in drive-by shooting), ruled in Selective's favor stating "it is determined that the parties to the insurance contract did not consider this type of incident when entering the contract and further there was no substantial nexus between the accident and the use of the automobile." Plaintiff appeals claiming the judge erred in his application of the "substantial nexus test." We find the facts sufficiently clear for us to rule on the coverage issue. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). We reverse and find that UM coverage is available to plaintiff.

## II.

Compulsory uninsured motorist coverage was designed "to provide maximum remedial protection to the innocent victims of financially irresponsible motorists and to reduce the drain on the financially-troubled Unsatisfied Claim and Judgment Fund." *Riccio v. Prudential Property & Cas. Ins. Co.*, 108 *N.J.* 493, 503–504, 531 *A.*2d 717 (1987); *see also Lundy v. Aetna Cas. & Sur. Co.*, 92 *N.J.* 550, 555, 458 *A.*2d 106 (1983); *Fernandez v. Selected Risks Ins. Co.*, 82 *N.J.* 236, 412 *A.*2d 755 (1980). This case is unlike other reported cases. Most cases analyze the statutory language, "caused by accident and arising out of the ownership, maintenance or use of such uninsured or hit and run motor vehicle," *N.J.S.A.* 17:28–1.1(a), in the context of an intentional assault. Craig and Pomeroy, *New Jersey Auto Insurance Law*, § 23.2 at 274–75 (1997). *See e.g., Vasil v. Zullo*, 238 *N.J.Super.* 572, 578, 570 *A.*2d

464 (App.Div.1990) (denying UM coverage to a victim of an intentional stabbing by an uninsured motorist occurring after a minor car accident); *Cerullo v. Allstate Ins. Co.*, 236 *N.J.Super.* 372, 375, 565 *A.2d* 1125 (App.Div.1989) (denying UM coverage based on injury resulting from a punch by an unidentified motorist who stepped out of his car after being "cut off"); *Sciascia v. American Ins. Co.*, 183 *N.J.Super.* 352, 355, 443 *A.2d* 1118 (Law Div.1982), *aff'd o.b.*, 189 *N.J.Super.* 236, 459 *A.2d* 1198 (App.Div. 1983) (denying UM coverage based on injuries resulting from the deliberate firing of a shotgun by a passenger in an uninsured car during a random drive-by shooting). *See also Mondelli v. State Farm Mut. Auto. Ins. Co.*, 102 *N.J.* 167, 506 *A.2d* 728 (1986) (construing "occupying" for UM purposes); *Continental Ins. Co. v. Miller*, 280 *N.J.Super.* 85, 89–90, 654 *A.2d* 514 (Law Div.1994) (finding UM coverage available where uninsured vehicle rammed police officers in unmarked vehicle by interpreting "accident."); *Foss v. Cignarella*, 196 *N.J.Super.* 378, 382, 482 *A.2d* 954 (Law Div.1984) (holding in non-UM case intentional stabbing after minor car accident not covered by insurance agreement).

No doubt there was an accident here within the meaning of the statute and the UM endorsement. This was not an intentional tort or assault situation. The more difficult question is whether the accident bore a sufficient connection to the plaintiff's alleged injuries to afford a claim for redress under his UM endorsement. Resolution of this issue turns on whether the plaintiff's injuries "arose out of the ownership, maintenance or use of the hit-and-run vehicle" within the meaning of the statute. *See generally, Widiss* at § 11.4.

In our seminal case interpreting the phrase "arising out of," we stated

that the phrase "arising out of" must be interpreted in a broad and comprehensive sense to mean "originating from" or "growing out of" the use of the automobile. So interpreted, *there need be shown only a substantial nexus between the injury and the use of the vehicle in order for the obligation to provide coverage to arise.* The inquiry should be whether the negligent act which caused the injury, although not foreseen or expected, was in the contemplation of the parties to the insurance contract[,] a natural and reasonable incident or consequence of the use of the

automobile, and thus a risk against which they might reasonably expect those insured under the policy would be protected.

> [*Westchester Fire Ins. Co. v. Continental Ins. Cos.*, 126 *N.J.Super.* 29, 38, 312 *A.*2d 664 (App.Div.1973), *aff'd o.b.*, 65 *N.J.* 152, 319 *A.*2d 732 (1974) (object thrown from car by passenger struck pedestrian; owner, operator and passenger covered by auto liability policy) (citation omitted) (emphasis added).]

Although this interpretation was rendered in a liability coverage case, it has been applied by our courts in the similar context of UM coverage. *See Cerullo v. Allstate Ins. Co.*, 236 *N.J.Super.* 372, 565 *A.*2d 1125 (App.Div.1989) (denying UM coverage based on injury resulting from a punch by an unidentified passenger who stepped out of a car which was "cut off"). The substantial nexus test is applied somewhat differently in PIP and UM circumstances by New Jersey courts because of the objectives of the two types of insurance coverage. Coverage is broader in the PIP context than in the UM context. *Id.* at 374–376, 565 *A.*2d 1125. PIP statutory coverage is described more specifically than UM coverage. *See N.J.S.A.* 39:6A–4.[3] For instance, although the Supreme Court held that a bullet fired from a weapon in a random drive-by shooting was propelled "by or from an automobile" and met the test required for PIP coverage, such an act does not "arise from the use of a vehicle" to establish UM coverage because UM

---

[3] *N.J.S.A.* 39:6A–4 states:

> Every automobile liability insurance policy, issued or renewed on or after January 1, 1991, insuring an automobile as defined in section 2 of P.L.1972, c. 70 (C. 39:6A–2) against loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of ownership, operation, maintenance or use of an automobile shall provide personal injury protection coverage, as defined hereinbelow, under provisions approved by the Commissioner of Insurance, for the payment of benefits without regard to negligence, liability or fault of any kind, to the named insured and members of his family residing in his household *who sustained bodily injury as a result of an accident while occupying, entering into, alighting from or using an automobile, or as a pedestrian, caused by an automobile or by an object propelled by or from an automobile, to other persons sustaining bodily injury while occupying, entering into, alighting from or using the* automobile of the named insured, with the permission of the named insured, *and to pedestrians, sustaining bodily injury caused by the named insured's automobile or struck by an object propelled by or from such automobile.* [Emphasis added.]

insurance is not intended to cover intentional wrongs effected through an instrumentality other than an automobile. *Pomeroy and Craig* at § 21:3–2 (citing *Cerullo,* 236 *N.J.Super.* 372, 565 *A.*2d 1125, and *Lindstrom,* 138 *N.J.* 242, 649 *A.*2d 1272). Because the accident in the present case was neither an intentional wrong nor an act effected through an instrumentality other than an automobile, the "substantial nexus" test applied in the PIP context should be comparable in this UM case.

This case is a virtual twin of a PIP case decided by this court two years ago. In *Burns v. Market Transition Facility of New Jersey,* 281 *N.J.Super.* 304, 657 *A.*2d 472 (App.Div.1995), a "good samaritan" stopped his vehicle after witnessing a collision involving his brother who had been driving ahead of him on the highway. *Id.* at 306, 657 *A.*2d 472. The samaritan, a former EMT, rendered assistance to his brother until the EMT rescue unit arrived and then continued to help for an hour more by holding his brother's head to maintain an open airway. *Id.* at 306–07, 657 *A.*2d 472. In so doing, the samaritan brother was bent in an awkward position, partially in and partially out of the vehicle. *Id.* at 307, 657 *A.*2d 472. His brother was pronounced dead after being air-lifted to a trauma center. *Ibid.* The samaritan sustained back and shoulder injuries as well as psychological injury as a result of the accident and rescue attempt. The samaritan sought treatment for his injuries and filed a claim for PIP coverage with his automobile insurance carrier.

The carrier denied the PIP claim because his injuries did not arise out of his use of the automobile, *i.e.,* he was not using the automobile when any injures were suffered. *Id.* at 308, 657 *A.*2d 472. We reversed the denial of the claim for PIP coverage. We reiterated the principle that compulsory insurance statutes must be liberally construed to effectuate their purposes and held that

the test of substantial nexus with the use of an automobile has been met. Plaintiff's presence in the vehicle was not an attending circumstance. Here, an automobile accident was directly responsible for plaintiff's presence in the automobile where he was injured. While plaintiff may not have occupied the car when the

collision occurred, his occupancy was directly, even foreseeably, attributable to the accident.

[*Id.* at 309–10, 657 *A.*2d 472 (citation omitted).]

After reviewing the "rescue doctrine," which has long been a part of our State's social fabric, we concluded in *Burns,* "[i]n the traditional tort context, a tort-feasor is liable for injuries to a rescuer on the theory that the tort-feasor places someone in peril and it is foreseeable that others may try to assist that person." *Id.* at 310, 657 *A.*2d 472. *See also Layden v. Goodyear Tire & Rubber Co.,* 129 *N.J.L.* 54, 58, 28 *A.*2d 96 (E. & A.1942); *Eyrich For Eyrich v. Dam,* 193 *N.J.Super.* 244, 256, 473 *A.*2d 539 (App.Div.1984), *certif. denied,* 97 *N.J.* 583, 483 *A.*2d 127 (1984); *Harrison v. Middlesex Water Co.,* 158 *N.J.Super.* 368, 376, 386 *A.*2d 405 (App.Div.1978), *rev'd on other grounds,* 80 *N.J.* 391, 403 *A.*2d 910 (1979). Indeed, our public policy favoring those who in good faith render emergency care has been strong enough to command a statutory immunity under the Good Samaritan Act, *N.J.S.A.* 2A:62A–1; *L.* 1987, *c.* 296, § 1.[4]

▉▉▉ We conclude that the multi-vehicle accident apparently precipitated by the uninsured, and indeed unknown, vehicle X; the attempt by plaintiff to render assistance as a passer-by emergency medical technician; and the alleged cry of "fire" which started a stampede from the bus and which supposedly caused plaintiff's injuries, describes a scenario within the intendment of the UM coverage and the language "caused by accident and arising out of the ... use of such uninsured or hit and run motor vehicle."

---

[4] *N.J.S.A.* 2A:62A–1 states:

> Any individual, including a person licensed to practice any method of treatment of human ailments, disease, pain, injury, deformity, mental or physical condition, or licensed to render services ancillary thereto, or any person who is a volunteer member of a duly incorporated first aid and emergency or volunteer ambulance or rescue squad association, who in good faith renders emergency care at the scene of an accident or emergency to the victim or victims thereof, or while transporting the victim or victims thereof to a hospital or other facility where treatment or care is to be rendered, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.

*N.J.S.A.* 17:28–1.1. Although perhaps reminiscent of Mrs. Palsgraf's experience at the train station, *Palsgraf v. Long Island Railroad Co.,* 248 *N.Y.* 339, 162 *N.E.* 99 (1928) (4–3 vote against causation and liability), we conclude that there is a sufficient causative factual connection between the operation by the escaped culprit driver of vehicle X and plaintiff's claimed injuries to invoke the coverage and permit plaintiff to present his proximate causation claim to the arbitrators who will ultimately determine the issues of liability and damages. *See Yun v. Ford Motor Co.,* 143 *N.J.* 162, 669 *A.*2d 1378 (1996), *rev'd on dissent* of Judge Baime, 276 *N.J.Super.* 142, 158, 647 *A.*2d 841 (App.Div.1994). Ordinarily, questions of proximate cause are for the trier of fact. *Yun,* 276 *N.J.Super.* at 160, 647 *A.*2d 841 (Baime, J., dissenting). "The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective 'realm of foreseeability'." *Id.* at 159, 647 *A.*2d 841 (citations omitted). *See also Hill v. Yaskin,* 75 *N.J.* 139, 380 *A.*2d 1107 (1977).

The Iowa Supreme Court has come to a similar conclusion. In *Hollingsworth v. Schminkey,* 553 *N.W.*2d 591 (Iowa 1996), the Iowa Supreme Court found that an insured who injured his back while dragging a 250–pound uninsured motorist from his burning automobile was entitled to have a fact-finder determine the validity of his claim for UM benefits in the liability and proximate cause context. The uninsured motorist was aware that his vehicle's exhaust system was in serious disrepair when he drove his daughters to the hospital for treatment for carbon monoxide poisoning. Nevertheless, the motorist continued to drive the defective vehicle and later passed out, crashed and remained unconscious until found by the insured rescuer. Broadly construing the "arising out of" language of the UM endorsement, the Iowa Supreme Court held that summary judgment in favor of the carrier was inappropriate because a reasonable fact-finder could conclude that the rescuer was legally entitled to recover damages from the uninsured motorist for injuries which the rescuer sustained as a result of the accident caused by the motorist's improper maintenance of his vehicle. *Id.* at 596. The court stated that "the words 'arising

out of" are given a broad, general and comprehensive meaning," *id.* at 595, and specifically found that the fire was a foreseeable consequence of the operation of the vehicle and was not a superseding event sufficient to relieve the uninsured driver of liability for his conduct. *Id.* at 597.

Relying on the *Restatement (Second) of Torts* § 443, the Iowa court found that the rescuer's voluntary presence at the accident scene was a foreseeable consequence: "the intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." *Id.* at 597–598.

> "[The words] are commonly understood to mean originating from, growing out of, or flowing from, and require only that there be some causal relationship between injury and risk for which coverage is provided." *Id.* A policy provision covering injury "arising out of the use of the vehicle" conveys a more liberal concept of causation than "proximate cause" in its traditional legal sense. *Dairyland Ins. Co. v. Concrete Prods. Co.*, 203 *N.W.*2d 558, 561 (Iowa 1973).

*****

> We believe there is a genuine issue for trial upon Hollingsworth's insurance policy claim. Based on the facts in the record, a jury could find that Hollingsworth is legally entitled to recover damages from Schminkey for the bodily injury caused by the accident arising out of the operation, maintenance, or use of Schminkey's uninsured vehicle. Schminkey used his uninsured station wagon after learning the exhaust system had been damaged and carbon monoxide was being emptied into the passenger area. He became asphyxiated while driving the vehicle into his garage. The motor continued to run after the vehicle hit the corner of the garage. The tires continued to rotate until they became so hot they generated smoke and then a fire. Hollingsworth was injured while removing Schminkey from the burning station wagon. A jury might also conclude that Hollingsworth's act of lifting Schminkey is not an intervening act or force that breaks the chain of causal events between Schminkey's negligent operation of his vehicle and Hollingsworth's injury. Summary judgment should not have been granted to State Farm on this contract claim.

> [*Hollingsworth v. Schminkey*, 553 *N.W.*2d at 595–96.]

We take a similar view. We will not read a "good samaritan's" claim out of the UM coverage. The UM claim in this case must be submitted for arbitration on the issues of proximate cause and tort liability under common-law principles.

The plaintiff's presence on the bus, the alleged "fire," the passengers' panicked reaction to the alarm, and the claimed injuries could all be related by an arbitrator to the conduct of the so-called "hit-and-run" driver. But as Justice Clifford said in *Hill v. Yaskin*, 75 *N.J.* at 147–48, 380 *A.*2d 1107: "If so, and if plaintiff's injury proximately resulted therefrom, liability would follow. Mere statement of these propositions demonstrates ample room as well for a defendant's verdict."

Reversed.